Good morning everyone and welcome to the Ninth Circuit. I apologize for my ghoulish look on the screen, but there's a very bright light that shines through this time of day. Trust me, I'm not normally this pale. And with that, like I said, we have the one matter for today, 20 minutes each side, Oregon Right To Life. Council, we did send out the supplemental brief. I want to thank you both for turning that around quickly. And with that, Council for Appellant, you may proceed when ready. Thank you, Your Honor, and may it please the Court. My name is Jim Bopp. I represent Oregon Right To Life, the plaintiff and appellant in this matter. First, I'd like to thank you for postponing the argument from Thursday as I was appointed an IU trustee, which is a huge honor but an awesome responsibility. And we approved a $4.5 billion budget, never quite spent that much money before. But I appreciate you accommodating me on that. I appreciate reserving five minutes for rebuttal. Very well. This is a free exercise challenge to Oregon's abortion insurance coverage mandate as applied to Oregon Right To Life. The district court upheld the mandate, refusing a preliminary injunction and dismissing the case from which we have appealed. We believe the district court's analysis was erroneous in numerous respects, beginning with the district court's doubting that Oregon Right To Life's objections were sincerely religious. The court, I think, misapplied the standards for judging sincerely religious beliefs with respect to their sincerity. First, the Supreme Court's been very clear that a person's assertion that a belief is based upon a religious basis is to be given, quote, great weight, end of quote. And these religious beliefs include moral or ethical beliefs of right and wrong, but does not include purely philosophical beliefs. There are numerous assertions in the record by Oregon Right To Life that their belief in the sanctity of individual human life and opposition to abortion is based upon religious tenets. The complaint paragraphs 14, 16, through 19, 30, through 34 are examples of those assertions. Furthermore, the bylaws of Oregon Right To Life specifically are based upon, and their activities are based upon, traditional Judeo-Christian ethics. And finally, they use religious terminology when they talk about their view on human life, and it's by using the phrase sanctity rather than a secular term such as inherent value. So, counsel, let me jump in because let's say, for just the purposes of let's say we agree with you on this point, that the district court missed this issue and that you're correct. What do we do next? Do we have to reach the other issues in this case, or is that enough to say, time out, we got to start this whole thing over because you started off on the wrong, you know, on the wrong lane effectively? I understand you have a lot of discretion in how you deal with issues that are raised on appeal. The district court did reach the question of whether or not rational basis applies to the mandate and found that the mandate was neutral and generally applicable and passed rational basis scrutiny. There's a matter of, of course, judicial economy here. The district courts already considered the next step, as you correctly described it, and we believe got it wrong. And to preserve both your time and the district court's time, it seems appropriate, but, you know, that's your decision to reach that issue and we would urge you to do that. So, fair enough. So, your thinking is that in some respects, the second issue, I'll call it the Catholic Charities issue, second issue is more central to this case than the first issue, I take it is what you're saying. I think it is. And I think, you know, I respect the district court, but I think respectfully, they got that quite wrong, that it's really a preliminary issue. And the central issue is whether or not it is entitled to rational basis review. And we would, we would appreciate if you didn't reach that. Now, going to that issue, there are three bedrock principles. The measure cannot allow for individualized exceptions to the rule and the federal funds preservation exception does that. Secondly, it cannot treat comparable secular activities more favorably than comparable religious activity. And both the grandfather exception and the federal funds exception does that because both are based on secular reasons. And the third is it cannot show hostility to some religious beliefs. And of course, that's the religious employer exception, which the state, the director correctly characterizes as principally involving churches. Now, looking at the grandfather except grandfathered exception, and that is for plans in effect during 2017, which excluded abortion, of course, that, in our view is not either neutral or general. It is based on that exception is based on purely a secular reason or basis that it was in the plan was in effect in 2017. It then treats those plans based upon secular conduct more favorably than comparable religious conduct, which is the exception, the exact similar exception that Oregon right to life believes they're entitled to based upon their religious beliefs. And finally, it does not just benefit a religiously-based organization, which would be Providence's health care plan. In fact, as conceded by the state, there was a Samaritan health care plan that was also in effect in 2017. It is also exempt, but there is no nothing in the record that the Samaritan exception, that is, it didn't cover abortion was based on any religious exemption or purposes or reasons. So, you know, that was a purely secular decision based by Samaritan, but it benefits from the exception. The next is the religious employer exception. And of course, to see what that means, the statute cites a definition of religious employer, which had the following criteria, whose purpose is the inculcation of religious values. Well, if you if you look at that, generally, that's not what Oregon right to life does. It doesn't talk about immaculate conception and all, you know, all the different things that could be involved in religious values. But it does focus on protecting innocent human life, which they do believe is as is based upon their religious beliefs. And so if you narrow this to just their view on the sanctity of individual human life, I guess you would say they did didn't meet this purpose. The second is, but it's but it's vague. We don't know. The second is that it primarily employs persons who share the religious tenets of the employer. That is, of course, not the case. They do not give any kind of religious test to any of their employers or employees. They do require adherence to their pro-life ethic. The third third is primarily service persons who share the religious tenets of the employer. And of course, that's not at all applicable. They are willing to provide pro-life education and other services to absolutely anybody that seeks those services or education. So that clearly and unquestionably, the Oregon right to life does not meet. Now, as I mentioned on page one of their brief and actually several places, the director concedes that, quote, that this is, quote, a narrow class of religious organizations like churches. So the question is now, can we distinguish between various types of religious organizations? And certainly the Catholic Charities Bureau case just a few days ago and inclusively established that it renders a exception to be not neutral regarding religious beliefs if if it distinguishes between different types of religious organization. Now, Oregon right to life in the Oregon definition of religious employer, of course, as I mentioned, they mentioned the religious employer is a not for profit employer whose purpose is the inculcation of religious values and that primarily employs and serves persons who share the religious tenets of the employer. Now, the definition of a protected religious entity in Wisconsin, it was considered in the Catholic Charities case involved the requirement that the organization proselytize or serve only call religion. This is really identical to Oregon's and to limit services to church members, which is also identical to Oregon's requirements. Well, in Catholic Charities, the unanimous U.S. Supreme Court said that this is, quote, that this consideration is inherently that these are inherently religious choices, which renders the mandate non-neutral because it, quote, facially described differentiates between religions based upon theological choices and a quote. So it seems pretty conclusively established in our opinion that limiting the religious employer exception to only basically churches renders that exception to be not neutral, not generally applicable, and therefore renders the entire mandate unconstitutional. So, and of course, the other point raised by the states about that language in Catholic Charities is whether or not that rationale is limited only to establishment cases, but also would apply to free exercise cases. Well, that is addressed on page 890 of the Catholic Charities case where the court said the establishment clauses prohibition of denominational preferences is intrinsic, is intrinsically connected with the continuing vitality of the free exercise clause. So they said, in our view, quite clearly that this notion that you cannot discriminate between religious organizations based upon their theological choices and what kind of theological activities they wish to engage in is applicable to the religious clauses generally, both the establishment and free exercise clause. The final exception is the federal funds exception. And this is an exception granted when it is necessary to preserve federal funds. They will give an exception to the mandate. Well, this is a case, you know, this problem with this is number one, that is a secular reason whether or not you're going to preserve federal funds. And of course, to organizations that, you know, they want to preserve the federal funds, which is a secular reason, will be granted a exception from the mandate, but not people based upon their religious objection. Secondly, it provides for an individualized exception, because there has to be a case-by-case determination of the following items. First, whether the mandate may affect the availability of the federal funds. And secondly, whether or not to actually grant the exception. And of course, there are no criteria established to make that individualized determination in the statute. So, it fails on the basis of this standardless individualized exception. So, really all three exceptions are wanting, and we only have to demonstrate one of them. And certainly, we view all of them to be such. The final thing, which you might, I think you must reach, is the fact that the case was dismissed. So, it's not just, so that seems like maybe the real threshold decision. It wasn't proper to dismiss the case, and then you would turn to the issues surrounding the preliminary injunction. And in that one, it's, you know, pretty short and pretty simple, it seems to us. The district court dismissed the case based upon the determinations that were made in consideration of the preliminary injunction. And however, there are different standards in preliminary injunction determination from dismissal determination. The district court focused on whether any facts were disputed, which is something you would consider in a preliminary injunction. But with respect to the dismissal, it's whether the claims are plausibly suggested by the facts alleged. In other words, you look at the complaint. You don't look at, are there other facts in the record that would contradict these assertions? You just look purely at the assertions to determine whether a plausible claim has been suggested by the facts alleged. So, you can't bootstrap a dismissal on preliminary injunction findings. They're a separate legal standard. And you could lose a preliminary injunction without having the dismissal because the standards are different. And I thought that should certainly have been the result in our opinion here. Well, I thank you for permitting me to argue remotely and not last Thursday. And I look forward to any rebuttal I might have. Unless my colleagues have any questions, it doesn't look like it. Okay, we'll go ahead and reserve the remainder of the time for rebuttal. Thank you, Mr. Price. Mr. Whitehead, you may proceed when ready. May it please the court, counsel, Carson Whitehead for defendant Andrew Sulfi, director of the Oregon Department of Consumer and Business Services. So, I'd like to start out with the procedural posture of this case because I think that does matter. And the first issue to resolve is whether the district court correctly granted defendant's motion to dismiss. So, we're not here primarily on the preliminary injunction. We're here first on the motion to dismiss. And I think only if this court determines that the district court erred in granting the motion to dismiss does it need to get to any of the issues raised by the preliminary injunction appeal. And we very much dispute that the district court applied an incorrect legal standard. We filed a motion to dismiss based on the complaint's failure to state a claim purely on legal grounds that the Reproductive Health Equity Act is a neutral law of general applicability, which is a legal question, and that it does survive rational basis review on the facts as alleged in the complaint. So, there are no disputes of fact here. The issue is whether, as a matter of law, the RAGA is a neutral law of general applicability under Smith, and then whether it survives rational basis review, which we think it easily does. So, in this as applied challenge, plaintiff Oregon right to life argues for an extraordinarily broad construction of the free exercise clause, one that effectively requires a religious exemption for anyone who objects to a state policy whenever the law includes exemptions, including exemptions that accommodate religious belief. The free exercise clause does not require that result. Here, the RAGA contains exemptions that operate to accommodate religious belief. First, the exception for religious employers permits an insurer to offer plans that exclude coverage for abortion and contraception to a narrow class of religious employers, such as churches. So, as we said in the brief, and we agree with the plaintiff's characterization that it is a narrow class closely to entities like churches, perhaps seminaries, those that train individuals. So, counsel, assuming that Oregon right to life is religious, so that's a whole separate question, but let's assume that, which I think that's what you're doing right now. I'm not asking you to concede that, but asking you to assume it. Your argument that Oregon does give some religious exemptions and give, but if they're not giving it to this religious organization, then the obvious inference that is, well, you're discriminating between, or Oregon is discriminating between religions, maybe not invidiously, you know, often that doesn't happen. You know, when I used to, when I worked for the state of Nevada and we did prisoner cases involving religious claims, oftentimes the prison wasn't trying to discriminate invidiously. They were trying to actually accommodate a religion, but as soon as they'd accommodate one religion, then some other religions said we need to come, you know, if you're going to give the Jewish inmates kosher food, you need to give the Muslim inmates halal food, you know, that sort of, so where is the line? I mean, I, I, in your briefing and, and, and this morning you, you, you emphasize that, you know, we are trying to accommodate some religions, but where is, but then if you're assuming that Oregon right to life is religious, at religious entity, you're not accommodating their religious concerns. And so how do we, what is the line that you're proposing that it is so where you can accommodate some, but not others. And it doesn't cross over into the type of discrimination. And I think recently the Supreme court in the Catholic charities case was concerned about. So your honor, I have a preliminary answer to that is that one is that as I pointed out in the supplemental briefing plaintiffs conceded in their complaint, or they alleged in their complaint that this very accommodation was an appropriate one under the establishment clause. Um, and, and Catholic charities accommodation we talking about, I'm sorry, the religious employer accommodation specifically. So, so the religious employer exemption that makes that narrowly applies to churches. So I was so confused by that because, you know, if I'm a, let's say I'm a Muslim prisoner and I could say, no, I think it's appropriate to accommodate the Jewish prisoners and give them and give them kosher food. I don't think it's inappropriate to, for you to have done that. I just think that you should also give me, uh, my hello food. And if you don't, then, then that's inappropriate. So I don't, I don't understand where the, where it's necessarily, uh, a concession on their part that, that affects our case to say, yeah, we're really glad you gave this accommodation. We just think that if you did that, you also need to do this too. Uh, so I, I think that matters because I think new neutrality under the free exercise clause cases and neutrality under the establishment clause cases have meant somewhat different things. Um, and you know, the, of course those two clauses in the first amendment are related, but the free exercise clause, you know, is, is concerned with the disfavoring religious practice. And the establishment clause is concerned as Catholic charities just discussed is, is about the state expressing denominational preference between religions. And, and so I think the emphasis, I assume I, yeah, I saw your supplemental brief kind of lay that out. And the challenge with that is if you actually, you know, first I read Catholic charities, the majority opinion, and you know, it was notable that they, they tend to refer to it as the religion clauses, plural, right. That's how they refer to it. And, and so that got me thinking, well, well, which is it, you know, cause you had said in your supplemental brief that it was establishment cause. So then I went and looked at, um, Catholic charities, merits briefs, the spring court and Catholic charities at least made the argument at length that this is not a free exercise. This is not establishment cause it's both, you know, and they actually go through and they say, these are your free exercise cases. These are your establishment. These are your both cases. And they, so I'm not in the Supreme court. There seems to be language in, in Catholic charities that says that. So your, your, your attempt to try to parse it off into two different worlds. Don't you feel like that kind of runs into the language in Catholic charities that, that itself says that, well, it kind of both. Well, respectfully, your honor, I think the wording of, of Catholic charities focuses very much on the establishment clause. And that it does say, of course, the two clauses are related to the extent that if the government is showing preference for one religion under the establishment clause, um, it's, you know, kind of subtly maybe, um, or in, to some degree, showing a preference the establishment clauses prohibition of the nominal preferences is inextricably connected with the continuing vitality of the free exercise clause too. I mean, that, and, and so that seems to cut directly against your, you're trying to put in these two boxes. I think at a very high level of generality, of course, the two clauses are connected, but I think if, if you take the notion that, that Catholic charities is saying that any, you know, if an accommodation for religious practice, um, that draws, you know, some potential distinction for on, on establishment clause grounds, then that can show a lack of neutrality under the free exercise case law. I think that would be a very, a subtle way for the Supreme court to undermine the entire framework of free exercise cases. And I don't think that was Catholic charity. I'm struggling to understand it, but why, why is that? Why, why does, why does taking this anti-discrimination principle, not just between religion and the secular, but also between religions and, and seeing it under free exercise, why does that hurt the free exercise class? I think it makes it very difficult because if, if the law is going to have accommodations for religious belief, there has to be some way of determining what a religious belief is or what groups qualify under that exception. Um, and this is something I think that the courts have with going back to the cases in the, in the late 19th century, all the way up through incorporation of, um, the protections, uh, of the first amendment to the States of how you draw that line where a law is an appropriate accommodation for religious free exercise, and maybe even some cases required by the first amendment. Um, and then, but not tip over into the realm of the law being an inappropriate, um, uh, preference for religion. And so I think there has to be, it can't just be saying, well, this, the law talks about religion and provides an accommodation. Therefore you jump to strict scrutiny. Um, and so I'm not sure where the line would be for, um, Oregon right to life, because you know, in this case we have, it's an as applied free exercise challenge for a group that meets none of the requirements for the religious employer exceptions. So they're not, they, they don't seek to inculcate religious values. They are not one of the, the nonprofit organizations set out in the internal revenue code. So they're not a church or an auxiliary of a church, and they're not an, a religious order, um, organized for exclusively religious purposes. Um, so they don't meet any of those requirements. And I think what their, their supplemental brief suggests is that any of those requirements standing alone is enough to subject a lot of strict scrutiny under the free exercise clause. And I think that's enormously problematic because it would suggest that say that the, the longstanding clauses in the internal revenue code facially discriminate based on, on like kind of, I mean, if I understood correctly, when I looked at all the briefing in the Catholic charities case, I mean, that was something that people were conducting the government, the federal government, uh, file briefs and stuff. And I think that was their concern was that in the Catholic church case. So I, that may be a real concern, but I I'm just struggling to see, I mean, if you were to say just fundamentally, we, if you are an evangelical, I'm not using the capital E, but you are a type of religion that evangelizes, then you get the exception. If you are a type of religion that does not evangelize, you don't get the exception. Is that, is that problematic in your view or not? I think that would be, I think that would be very problematic under Catholic charities, but again, I don't think we get there on this case because it's, I mean, Oregon right to life does none of those things. And we're in the posture of an as applied. So that's an argument on the first issue that we were kind of assuming that, you know, whether they're actually a religious, respectfully, your honor, I think that only you can only assume that they have, and what the state acknowledges for purposes of the motion to dismiss is that yes, they have a religious belief and that religious belief is burdened by this law. I mean, we did, we dispute their PI showing on that point, but I don't think we can, as you can't assume that they meet any of the organizational requirements for their religious employer exception. In fact, they, they stay in their complaint that they didn't apply because they don't meet those. And so I, I, I think that. Yeah, no, maybe I, maybe I misspoke. I meant that you, we were, I was assuming that they would meet whatever the standard is to be religious for purposes of the free exercise clause, the first amendment, not, not right. So I think everybody agrees they don't meet Oregon's religious or religious entity exception. So, so what I think I think that means for this case is that it makes it very, they're not backs to kind of talk about those nuanced distinctions. Like if you're like the Catholic charities, I think again, was an as applied challenge with a very developed record about that. The Catholic charities organization in that group was doctrinally prohibited from proselytizing in their provision of services. They could evangelize during those services during those provision of services, they would kind of tell their personal stories, but they couldn't actively try to make converts. And those sorts of distinctions that were about the, the very specific religious beliefs of Catholic charities, as opposed to other religious groups that would qualify under the exception. Those, I think those facts really mattered for the development of the case below. And they also really mattered to the unanimous decision from the Supreme court, because, you know, that record, I think quite clearly showed that if you had say a, a traditional, you know, a, a church that, that engaged in more proselytizing, whatever that, that church might be say a Protestant denomination that always proselytized when it, you know, handed out, when it, when it operated a soup kitchen and you had Catholic charities who did not proselytize when it operated a soup kitchen, that the, the Protestant denomination would get the exception and the Catholic one would not. And we don't have any facts like that in this case to suggest. I guess I'm struggling with that because I thought that a fact in this case is that Oregon right to life says that they, that they for instance, that they'll hire non-religious people. But as I understand your religious exemption requirements, it would, you'd have to basically hire your own adherence, right? And then you'd have to serve your own adherence. Whereas Oregon right to life, kind of like Catholic charities goal is to sort of serve anybody it's to take and sort of, so I, isn't there some, some similarity there, or it's your argument that gather similarity, but it's not defined enough, but that's the case. And how can you win it at, at motion dismiss stage? Well, I, I think it's, it's not just that there's, there's not enough similarity there. It's that they wouldn't like, I don't think prudentially that this court or any court should reach that question because they obviously don't qualify like under the internal revenue provisions, because they're, they're not as closely associated with another church. And so it's in terms of like getting to a, a theological or trinal difference that shows discrimination in this case, that is that Hobby Lobby, you know, wasn't affiliated with a church, right. You know, it wasn't, but yeah, it was still religious enough to be. And so then if you were somehow to, to discriminate against a religious organization like Hobby Lobby was determined to be by the Supreme court because of its because it didn't Hobby Lobby didn't evangelize when you go in to buy whatever this, my wife buys at Hobby Lobby. They don't, they didn't, you know, try to evangelize you. Whereas if that was the basis, then you seems like that's Catholic charities, right? It's very, well, I think Hobby Lobby doesn't have much play here because that was a riffraff case of understanding that that wasn't an establishment cause place. It's not constitutional. And so that case jumped straight to effectively, you know, the, the statutory version of strict scrutiny under federal law. And so we don't have that overlay here and we're squarely in the world of under employment division versus Smith, which is the applicable framework. And under, you know, this court's discussion of Smith and fellowship of Christian athletes and in Tingley, how did those requirements for neutrality and general applicability play out when you have exceptions built in to a law? And I think what those cases all get to is, you know, the neutrality requirement, are there departures for neutrality that suggest hostility, even I think subtle departures of neutrality, that's enough under Fulton. Are there, I mean, sorry, under, you know, masterpiece cake shop are there, you know, individualized exceptions that are discretionary in a way that undermines the state's, the general applicability, you know, are there requirements ultimately that suggest the government is disfavoring religion. And as for these exceptions, we just don't have that. You know, they are fundamental. Counselor, excuse me, this is judge Schroeder. I just want to ask you a question. I think I understand your answer there, but I was wondering if you could comment on our decision in Storeman's versus Weissman and whether you think it applies in any way or whether it has been affected by Catholic Charities. We talk about Storesman extensively in our briefing. I don't see that Catholic Charities overrules any portion of Storeman's. So I think that decision is certainly still binding circuit precedent. And so all the discussion of that case in our brief is still good law. And I think ultimately this case presents similar questions to Storeman's and Storeman's hasn't been affected by subsequent free exercise cases from this court either. Counselor, let me follow up on a question there. So opposing counsel yesterday filed a 28-J letter showing the Supreme Court has been GBRing a number of cases. Seeing that's what they're doing, shouldn't we effectively do that in this case to the district court to allow the district court and to the parties to fully consider what relevance, if any, this new case Catholic Charities has on our case here? Well, I'm not aware of a Ninth Circuit practice that's that analogous to a GVR. I mean, I think it is very common for the Supreme Court to GVR a case, but that's not a decision on the merits. And I don't think that it's appropriate for the court to look at the GVR. I don't mean that we look at it to say, oh, they're holding this, they're holding that. Look, fair point. I think in the 28-J letter, they say we should read in a certain holding in the GVRs. I'm not sure that I agree with that. But the Supreme Court is effectively saying do these over. And if they're saying do it over, shouldn't we do it over? Well, you know, I'm not sure. I mean, I'm trying to think of how you would overturn to say to the district court, you got it wrong on your motion to dismiss and do this over based on Catholic Charities again, because I think this case just doesn't really raise the Catholic Charities issue. So notwithstanding the Supreme Court's practice in GVR in cases maybe a bit expansively, I don't think that would be appropriate here when you have a ruling speed up on the motion to dismiss that I think is that this court can exercise de novo review and say yes or no. I mean, it could certainly consider the effect of Catholic Charities on that. But I don't know that kicking it back with reversing kind of in the same way as a GVR would be appropriate and that the state would ask that you not do that. Let me ask a question I asked opposing counsel at the beginning. I know we're over time and that's my fault. I'm not yours. So he began by talking about the district court's assertion that this was not a sufficiently religious organization. I'm not getting the terminology quite right, but effectively, that's what they said. If we disagree with that, what happens in this case? Let's say that's the issue we start with and we say the district court got off on the wrong track from the beginning. What should we do? Well, so there are two rulings from the district court in front of you, the motion to dismiss, and that does not depend on the ruling about the religious nature of the beliefs. And then on the preliminary injunction ruling, we argued below that their preliminary injunction showing just wasn't sufficient on the facts. And we walked through those facts in the brief and that this court would review for abuse of discretion, the PI ruling, and would look at the fact findings that are contained in the PI ruling to see if they're clearly erroneous. But ultimately, the court, I think, has to reach the motion to dismiss. So similar, actually, to what opposing counsel said. At the end of the day, we got to take on the big issue in this case. I think that's right. I think this court demands this decision below requires this court to consider the motion to dismiss. Judge Owens, I know we're over time. Yeah, go for it. It's consistent with what we were just talking about. The issue of whether or not Oregon Right to Life is a religious organization. What is the evidence that cut against that? What I saw, and I'll say one thing to try to speed things up. What I saw, one of the main things to rely on was the, I think it was the director or some leader saying during a deposition that it couldn't think of times when it had presented itself as a religious organization or something like that. What struck me about that was that that's not really evidence that against as much as it's not evidence for. You're not conceding that there weren't times. And even if they weren't holding themselves out, it wouldn't necessarily be. So putting that to the side, because as I understood it, that seemed like a pretty big thing that the lower court was relying on. What other evidence was there that this entity is not a religious organization? So again, I think on the P.I., I think it's their burden to show that their religious, their beliefs are religious in nature and show that they have that the law imposes a constitutionally significant burden. Well, they have a little bit. They have sanctity of life. Sanctity sounds religious to me. Certainly. And they have the Judeo-Christian stuff in there. So let's say that that's some. But what is weighing against that? I'm trying to figure out. So I think their notion that they're a membership organization that has no religious test for membership, that they don't have a religious like a requirement for any specific religious belief for their directors. Charities. I saw somewhere that that was true, actually, of of even, you know, it sounds funny because their name was Catholic Charities. But to be a to be an either an employee or maybe a Catholic Charities, you don't have to be Catholic. So there there were two aspects of the exception at issue in Catholic Charities, two prongs. And the first prong wasn't an issue. And that was that the nonprofit was affiliated with a religion. And so it's so plainly like that was under control of the Catholic Diocese. So plainly Catholic Charities. That was the deal is, is that I mean, so maybe that's an argument is that Oregon right to life is not has no affiliation with any religion that we would commonly like Catholic name, your denomination, Muslim, Jewish, whatever. It doesn't it just doesn't behind. So that's one argument is that it doesn't have. OK, I think that's right. And I think also the nature of it as a membership organization, I believe what the their bylaws and deposition testimony bears out that anyone you know, people without religious beliefs at all could be members. They could. So let me ask you about that, because it occurred to me as kind of, again, looking back at Hobby Lobby, it seemed like Hobby Lobby was was considered to be a religious type organization. I realize it was Riffra, but Riffra protects religion like it does. And so but it was considered to be that because the owners, you could almost say, happen to be the Green family. I think they were happen to be religious. Right. Like if if if, you know, somebody else came in and bought Hobby Lobby, it could immediately, I guess, become nonreligious. And so doesn't the fact does it does that mean much that they don't have written down that you have to be religious if in fact they are religious, which if I recall correctly, they've given affidavits and stuff saying we're all religious and religion is what animates us or something. The fact. So, your honor, the district court opinion helpfully talks about Hobby Lobby and we talk about it some in the brief and kind of pointing out kind of the differences in the evidence in Hobby Lobby, which was quite extensive. And it was a closely held corporation that really had to impose like these beliefs as like as a requirement for, I think, the members of the board in ways that just aren't present here. So I think this case is pretty readily distinguishable from Hobby Lobby in the ways that that we talk about. But your argument is that they don't they don't require it as some sort of like criteria, like a written criteria, like you can't to be a member of our leadership in Oregon right to life. You have to be religious. But if it turns out that everybody is or the majority is or the vast majority is, which I think is kind of their allegations, does it matter that they don't have an explicit requirement? In other words, is it possible that Oregon right to life could not be a religious organization, but this Oregon right to life is a religious organization or is that does it have to be some sort of written criteria? I don't know that it has to be a written criteria, but it is a factual showing that they have to to make. And so on the combination of facts that they brought forth on the on the P.I. and that's what we we think wasn't enough and what the district court marched through that that evidence pretty extensively and you know kind of the key I think allegation and what the kind of the key document was, you know, either their charter or bylaws that said they adhere to Judeo-Christian ethics and that was kind of a broad based ethical notion that the court didn't think and we don't think gets them to a showing of religious belief, particularly when you add in the fact that members don't have to adhere to any particular religion. There's no particular religious affiliation and there's no religious requirement for leadership. And the Jewish religion doesn't share this belief anyway. But I see, you know, if someone of Jewish heritage who had a secular opposition to abortion, they could certainly join this organization. So I'm happy to answer any other questions that the panel might have. I see I'm well over time. Yeah, well, yeah, and that's because you had a lot of questions. You were not slow to the draw. You were quick to the draw. You just had a lot of a lot of shots coming your way. So thank you very much, Mr. Whitehead. We'll hear from opposing counsel. Microphone, sir. There you go. I think this was my first Zoom call. Anyway, thank you for that. I want to look at this from the big picture. The Free Exercise Clause protects individuals to exit to freely engage in the activities that they believe their religion requires. And the government, if they want to prohibit this, you know, that there are certain tests demanded under the First Amendment. So if somebody goes to baptize someone in the Wabash River, right down the street here, the Wabash River, the government can't say no baptisms in the Wabash River. Yes, you can go fishing and go swimming. You know, that would be discrimination based upon religious beliefs. It does not require you to be an organization. You know, it does not require you to be a church that passes certain theological tests, because that's exactly what the state of Oregon is doing. They are saying, well, you're not religious because you're not affiliated with some religious organization, or you don't proselytize, or you don't limit your activities to benefiting only members of your church. You know, they are establishing, and they're being very candid, and I appreciate that candor, that this is a church. The gulf between that argument and the First Amendment could not be greater. And so that's the big picture. Second, Hobby Lobby, surely that shuts the door on you have to be a church. Hobby Lobby in no way or form was a church. It, however, was made up of people that had a religious belief that they wanted to freely exercise, and that was not to not be required to provide abortion insurance for their employees. And that belief of those individuals in that organization was then recognized and upheld by the United States Supreme Court. And furthermore, it's perfectly logical. How can something be neutral and generally applicable if there are people with certain religious beliefs, like they don't proselytize, or maybe they don't do the Eucharist or whatever, that they can be prohibited? But people that do approve things that the government thinks is okay for religious groups to do, well, if they do those, then we'll give them the exception. I mean, how in any world is that neutral or generally applicable when there are people with religious beliefs that are not protected because they don't pass some theological test that the state of Oregon is imposing upon them in order to benefit the exception? So I think if you look at it from the big picture, I know there's always ambiguities in various opinions, and maybe they don't address things we would like for them to do in the clearest possible way, whatever. But in the big picture, this just makes no sense under the general understanding of the pre-exercise clause, in my opinion. So thank you, Ioannis, for allowing us to participate. I'm not seeing any further questions from my colleagues. I want to thank both of you for your argument, your briefing, your 28 Js. This is an evolving area of law, and I appreciate both of you staying on top of it. This matter is submitted, and this panel from last week is now adjourned, and we'll move into conference. Thank you, everybody. Thank you.
judges: SCHROEDER, OWENS, VANDYKE